FILED
NOV 16 2016
Clerk, U.S. District & Bankruptcy
Courts for the District of Columbia

# UNITED STATES DISTRICT COURT
## DISTRICT OF COLUMBIA

**Keith Fernandez**
101 Integra Village Trail, Apt 125
Sanford, FL 32771,

**National Diagnostic Solutions LLC**
1540 International Pkwy, Suite 2000
Lake Mary, FL 32746,

*Plaintiffs,*

Vs.

**Republican National Committee, & Its Associated State & Local Affiliates**
310 First Street SE
Washington, DC 20003

**The State of Florida, Florida Highway Patrol**
133 S Semoran Blvd
Orlando, FL 32807

**City of Lake Mary, Lake Mary Police Department, Officer Ionut Komives**
165 E Crystal Lake Ave.
Lake Mary, FL 32746

**Seminole County, Seminole County Sherriff's Office, Officer Scot Vanderweide**
100 Bush Blvd.
Sanford, FL 32773

**Aspire Health Partners Inc., Dr. Valerie Westhead**
919 East Second St.
Sanford, FL 32771

**Orlando Health, South Seminole Hospital**
1414 Kuhl Ave.
Orlando, FL 32806

*Defendants,*

Case: 1:16-cv-02309
Assigned To : Contreras, Rudolph
Assign. Date : 11/16/2016
Description: Pro Se Gen. Civil

# COMPLAINT

Plaintiffs Keith Fernandez and National Diagnostic Solutions LLC ("Plaintiffs") bring this Complaint for defamation, invasion of privacy, gross negligence, intentional inflection of emotional and physical distress, malpractice, abuse of process, police misconduct, false arrest and false imprisonment against the Republican National Committee, its Associated State & Local Affiliates, the State of Florida, Florida Highway Patrol, the City of Lake Mary, Lake Mary Police Department, Officer Ionut Komives, Seminole County, the Seminole County Sherriff's Office, Officer Scott Vanderweide, Orlando Health, South Seminole Hospital, Aspire Health Partners Inc. and Dr. Valerie Westhead.

## JURISDICTION AND VENUE

1. This Court enjoys subject matter jurisdiction over this action under 28 U.S.C. § 1332(a)(1) because the Plaintiffs and Defendants are citizens of different states and the amount in controversy exceeds $75,000.

2. This Court enjoys personal jurisdiction over the Defendants because the gross negligence, harassment and intentional infliction of emotional distress and physical abuse were primarily directed by the Republican National Committee, located at 310 First Street SE Washington, DC 20003, through its network of Local & Regional Affiliates and in collusion with Local Law Enforcement with the malicious and grossly negligent goal of making a political example out of the Plaintiff to influence major upcoming local, state and federal elections.

## THE PLAINTIFFS

3. Plaintiff Keith Fernandez is a 28-year old man who prior to the facts contained within this lawsuit lived a very private, quiet and unassuming life with no history of mental illness. He is not a public figure or politician. Keith grew up locally in Orlando where he graduated from his High School as Valedictorian of his Class, a National Hispanic Scholar and Captain of his Soccer Team. Gaining admittance to numerous Ivy League institutions, Keith subsequently pursued his undergraduate studies at Harvard University where he graduated *cum laude* in 2010 with a degree in Economics. Upon graduating from Harvard, Keith worked for 4 years at some of the top firms on Wall Street as an investment banking analyst and private equity associate achieving a salary of $250,000 per year, before leaving to start his health-care Company National Diagnostic Solutions LLC **(See Exhibit A)**. For the 27 years prior to the events detailed in this memo, Keith had never visited a Psychiatrist, had no history of any mental illness, had never been prescribed a psychiatric drug and had no violent history.

4. National Diagnostic Solutions LLC is a health-care Company focused on providing mobile diagnostic imaging and testing services to physician practices and other healthcare organizations. The Company received the 2015 Award for Entrepreneurial Excellence from the National Society of Hispanic MBA's and was featured on Live TV as a Top Finalist in the "Start-Up" category in the 2016 Bright House Regional Business Awards.

## STATEMENT OF FACTS

5. On 8/16/16, Keith Fernandez sent a Confidential "Whistle-Blower" Memo outlining his knowledge of Large Scale Medicare Fraud of over $25 million & intent to sue for False Arrest & False Imprisonment to 3 Attorneys **(See Exhibits B, C, D and E).**

6. For the purposes of preserving confidentiality at this point in time, certain portions of the memo relating to the Whistle-Blower details have been hidden.

7. When sharing this Memo with these Attorneys, Keith explicitly stated that the Information contained in the Memo was to remain confidential, for preliminary legal review only and was not to be disseminated to any outside party. The memo contained an explicit confidentiality disclaimer stating this fact on every single page and each lawyer was warned about this beforehand.

8. Keith would subsequently learn that all of the information contained in the Memo would be leaked by these Attorneys to the public without his knowledge or consent setting in motion a sequence of events that would severely negatively impact his life and Company.

9. Directly after sending the Confidential Memo to these 3 Attorneys on 8/16/16, Keith began to notice peculiar and alarming behavior being directed towards him when he left his home and in public settings, suggesting to him that the Information contained in the Memo had been leaked.

10. Keith first began to notice the mass public intimidation, harassment, stalking and defamation at the Dunkin Donuts near his home. Beginning the morning of 8/19/16, 3 days after sharing the Confidential Memo, Keith noticed an excessive amount of Patrol Cars following him on the road and Trucks with NRA stickers (National Rifle Association) following him in the Dunkin Donut's Parking Lot wherever he went. These vehicles would attempt to block his path, oftentimes purposefully stalling in front of him for several minutes while staring at him menacingly.

11. Within days, the surveillance, stalking and harassment behavior and disruptions began to get so bad that Keith would often have to honk at the cars ahead of him to get them to finally move

their vehicles. Over time, even the Employees of the Dunkin Donuts began to notice this excessive surveillance and stalking behavior and became suspicious of the individuals and cars.

12. Additionally, beginning that weekend (8/20/16 – 8/21/16), and in what would become a trend over the next several months, Keith began to experience frequent bizarre intimidation events, harassments and public protests while riding his bicycle on the Cross Seminole Bike Trail near his home.

13. In particular, Keith began to be harassed by unknown Women dressed in Pink who would follow his bicycle wherever it went, trying to distract him to get him to crash his bike. Keith began to suspect that these "Women in Pink" were from MADD and were protesting him given he had previously been arrested for DUI.

14. Additionally, beginning that weekend, Keith began to witness hundreds of individuals dressed in "All Red" and "Highlighter Yellow" outfits positioning themselves awkwardly in front of him on the Bike Trail, trying to get him to crash his bike and otherwise protesting and harassing him as he rode.

15. Keith quickly realized that these individuals were representing and being directed by the Republican Party and were protesting him for threatening to file a Lawsuit & Reporting Police Misconduct in an attempt to influence a looming National Political Election.

16. In what would become a daily trend over the next several months, Keith also began to notice hundreds of targeted messages displayed on numerous license plates and rear window stickers of vehicles stalking him wherever he went. These license plates and stickers included messages such as BORCUA and SPIC (making fun of his Puerto Rican heritage), hundreds of messages containing different derivations of the letters DUI (OWI, DWI, DIU, OIU, etc.) publicly shaming

him for his previous DUI arrest, hundreds of special "Handicap" license plates making fun of him for his previous detainment in a Mental Facility, dozens of license plates containing messages such as "Hulk", "HGH" and "ARod" both making fun of his Hispanic heritage and alleging that he was on Performance Enhancing Drugs or Human Growth Hormone, license plates containing the words "Dealer" written at the bottom alleging he was a Marijuana Dealer, various special Veterans and Military license plates and stickers meant to insinuate that Veterans hated him, various NRA (National Rifle Association) license plates, license plates containing different derivations of the letters DIE and numerous political stickers supporting Trump / Pence.

17. Keith found these stickers and license plates bearing symbols of the NRA, license plates with derivations of the words DIE and stickers of various weapons and guns to be particularly malicious and incendiary forms of public intimidation as they could be interpreted as death threats and threats of violence.

18. Additionally, Keith began to notice hundreds of vehicles with their bumpers missing and vehicles with minor damage and dents to the outside of their cars recklessly driving past him to further intimidate and publicly ridicule him for his previous DUI arrest.

19. On Tuesday, 8/23/16, Keith began experiencing retaliatory police intimidation, road blockades and other framing events. Upon leaving his office late morning to drive back to his Apartment, Keith noticed that traffic was being intentionally blocked on International Pkwy, with a convoy of Florida Highway Patrol Troopers and Seminole County Sheriff Deputies escorting a Large Semi-Truck out of the ramp from 417. There was a large police presence on International Pkwy at the time and dozens of cars were being blocked from moving past the Intersection. Given the numerous police intimidation events directed towards him the previous week, Keith began to suspect that this was a "Coordinated Tactic" to delay him from reaching

his apartment so that Law Enforcement could have adequate time to frame him for smoking marijuana to enter and search his apartment and arrest him as retaliation for the Threatened Law Suit & Report of Police Misconduct.

20. At this time, Keith became very nervous sitting in his car that police were attempting to frame him for drug crimes.

21. Indeed, Keith's suspicions ended up being accurate. As soon as the traffic jam and police escort cleared and he drove back to his Apartment, he noticed a strong and pungent smell of Marijuana right outside his Apartment as he was putting the key in the lock on the door. Very nervous at this point that the Police were going to search his Apartment and try to frame him for Marijuana Possession, Keith immediately put on his biking clothes and got on his Bike to head to the Trail.

22. Upon leaving his house, Keith noticed a marked increase in Law Enforcement presence and in the number of Protesters on the bike path stalking and harassing him wherever he went. He also began to notice Families walking aggressive dogs on the trail as further intimidation tactics. At one point, a dog was let off its leash and chased Keith for 100 feet down the trail.

23. Extremely nervous once returning from his 30-mile bike ride on the Trail on 8/23/16, Keith immediately drove to the local Home Depot store to buy a Surveillance Camera for his Apartment.

24. Additionally, on 8/25/16, when Keith went to check his mail at his Apartment complex, he found a white package sent through USPS containing a vile of prescription medication, trying to further frame him for drug possession.

25. Over the course of the next week (from 8/28 – 9/3/16), the public shaming, stalking, harassment and intimidation events from the Republican Party, Law Enforcement, and the Insurance Company he exposed became even more pronounced and continued to grow.

26. At this point, Keith was being constantly surveilled, intimidated and threatened through a combination of the various techniques mentioned throughout this document.

27. During this time, Keith repeatedly tried to explain to his parents what was happening to him regarding the Whistle Blower Case and the large scale intimidation and harassment being directed towards him. Keith's parents, particularly his Mother, refused to believe him and were skeptical that these events were actually occurring. Keith also began to suspect that his Mother, a Republican Party supporter, was being tipped off by her network of friends and the Republican Party. Keith began to worry that his parents would try to Baker Act him, incorrectly believing that he was Schizophrenic and imaging these events.

28. Indeed, on 9/9/16, Keith received a phone call from his Father stating that he believed Keith was making up the entire situation and that it was "one big delusion and fantasy." Keith also suspected that his Mother was pressuring his Father to call the Police at the direction and influence of her Republican network and friends.

29. He told Keith that he had called the Police and that they were going to Baker Act him. While angry, Keith understood how the circumstances he was describing were extremely peculiar and unordinary and could be misinterpreted by his Father.

30. Given the heavy law enforcement intimidation that Keith was experiencing, he began to believe that the Police had been tipped off to the situation beforehand and were looking to "get

even" with him. This would allow them to further delegitimize his Claim of False Arrest in the Confidential Memo.

31. Furthering his suspicions that the Officers were tipped off beforehand, when going to lock his door, the Officer told Keith that "the lock was jammed and he would not be able to secure the Apartment," seizing his keys so that the Apartment could be further searched as he was confined. Keith knew that this statement was untrue as he had previously locked and secured his Apartment earlier that morning.

32. Additionally, when returning back to his Apartment days later, the lock on his door had been removed and replaced with a completely new lock and key without Keith's permission. Keith was the only individual on the Lease and any instruction to change his lock by another party without his explicit consent is illegal. This further solidified his belief that the Seminole County Sherriff's Deputies had been tipped-off beforehand, had intentionally tampered with his personal property and had seized his key in order to illegally search and surveil his Apartment.

33. When being arrested under the Baker Act, Keith also pointed out to the Officer that his Father was a Diagnostic Radiologist, had misunderstood the unusual circumstances that he was experiencing and that it was not within his Scope of Practice to make diagnoses of Mental Illnesses that could be used as a basis to initiate the Baker Act. Additionally, he noted to the Officer that options for voluntary treatment were never presented to him before considering the drastic step of Baker Acting him and that he had never refused voluntary treatment. He also noted that he was in no way an imminent threat to cause substantial physical harm to himself or to others, an explicit requirement for the Baker Act to be initiated.

34. Unsurprisingly, none of the above challenging attestations made to the Officer appeared in the Official Police Report written by Officer New.

35. Keith was then transferred to the South Seminole Hospital, owned by Orlando Health, where he stayed for several hours. When Keith arrived to the South Seminole Hospital he was instructed to remove his clothes and was put in hospital garments. Immediately, Keith noticed suspicious behavior by various member of the Hospital Staff who were assigned to treat him (in particular one Paramedic and one Physician), leading him to believe that these Hospital Staff members had been tipped-off.

36. In particular, as Keith lay waiting in a Hospital Bed, a severely mentally retarded man was brought directly to a seat within his line of vision. This man was dressed in an ALL RED outfit and was escorted by a Police Officer and a Paramedic. The man began to pound his head on the table and began chewing on the table. The Police Officer and Red Paramedic began speaking to the man like he was a child and began asking him awkward questions for minutes on end. Keith became suspicious that this was being done directly in front of him for the purposes of further intimidating him, implying that Keith was severely mentally retarded like the child.

37. This same Paramedic began treating Keith in a condescending manner, asking him questions like he was a child and treating him like he was mentally retarded. Keith became frustrated by this condescending behavior and believed he was tipped off by the Republicans.

38. Eventually, Keith confronted the Man about his discomfort with the way he was being discriminated against and treated while in the Hospital.

39. At this point in time, another Nurse entered his room, along with a new Physician that had arrived on the scene last minute. Keith began to suspect that this new Physician had also been tipped-off by the Republicans.

40. Keith attempted to further explain his situation and his discomfort with his discriminatory treatment while in the Hospital to this New Physician who he believed was tipped-off. She refused to listen to his complaints and told him that he could no longer freely speak. This Physician, then abruptly told Keith that if he spoke any further "he would be punished." When the Nurse heard this, she turned to the Physician and said to her: "you know, you can't really say that." This led Keith to further believe that the Physician was tipped off by the Republicans.

41. At this point in time, Keith immediately stopped speaking, fearing he "would be punished."

42. Ultimately it was too late at this point. Despite completely stopping from speaking, the Physician still came back into his room and proceeded to inject Keith with a strong Liquid Anti-Psychotic Tranquilizer.

43. As the extreme sedating effects of the strong tranquilizer began to kick in, Keith was transferred from his room to another area of the hospital. Given the negligently high dose of the drug injected and the fact that Keith had not eaten in hours, he lost complete conscience, almost hit his head on the floor as he was moved to another bed and urinated himself. Keith had a strong headache and "hang-over" effect that lasted for several hours after the injection.

44. At this point, Keith felt like he was being treated like an animal and political prisoner and strongly suspected that the Republican Party & Law Enforcement had tipped-off and influenced multiple people in the Hospital beforehand and during the course of his stay to further harass, emotionally intimidate him and ultimately physically assault him.

45. After staying at the South Seminole Hospital for several hours, Keith was then transferred to University Behavioral Center where he would stay for the next 3 days.

46. While at University Behavioral Center, Keith became further suspicious that many of the Patients and Facility Staff had been tipped-off by the Republican Party.

47. In particular, while Keith lay in his sleeping cell at night, his roommate, whom he had begun to suspect was tipped-off by the Republican Party, began acting strangely making repeated requests for him to "not close the bathroom door", despite it being a facility protocol. The man would then periodically creep out of his bed and proceeded to enter the bathroom on multiple occasions as Keith tried to sleep and would then periodically creep out of the bathroom door and back to his bed while staring at Keith.

48. After viewing this repeated strange behavior, Keith began to suspect that the Man had been instructed to do this by the Republican Party to intimidate Keith based on a previous "Attempted Sexual Assault" that Keith experienced while in the first Psychiatric Facility in November-2015. This previous event had happened in a similar manner (a Schizophrenic patient had emerged from the Bathroom late at night attempting to Sexually Assault Keith).

49. Keith had described this Attempted Sexual Assault event in great detail in the Leaked Confidential Memo **(See Exhibit B)** and knew that the Republican Party had previous knowledge of the details and were instructing this Man to behave this way to cause further emotional distress.

50. Additionally, over the course of his 3 day stay at the Facility, Keith began to notice further peculiar, bizarre and harassing behavior by "Patients" that had been planted in the Facility by the Republican Party, of which he can elaborate and describe in further detail.

51. In particular, an older Jamaican "Patient" wearing a "Camouflage" jacket began behaving strangely towards Keith over the course of his stay. This man began approaching Keith and telling him that he was "cousins with President Obama" and had "top-secret" information about the Pulse Night Club shooting.

52. Most concerning, one day this man approached Keith and said, "Once you leave the facility, I know you have some lawsuits to file." He then pointed to his leg, and pretended to inject himself, indicating to Keith that he knew he had received an injection while staying at the South Seminole Hospital. The only way this man would of known this fact was if he had been tipped off by the Republican Party, Law Enforcement or Hospital Staff beforehand. This further solidified in Keith's mind that the Republican Party was complicit in the injection at the Hospital and were widely disseminating his personal health information illegally.

53. Additionally, many tipped-off Patients and Facility Staff would awkwardly and randomly try and get Keith to drink numerous cups of coffee each morning and at meal times. Keith believed this was a tactic directed by the Republicans to get him to appear more fidgety and anxious, to extend his stay in the Facility.

54. On the Second Full Day imprisoned at the Facility and with no observation of Mental Illness, Keith was told that he would be put on Voluntary Status and could apply for Discharge. He left the Facility on Monday 9/12/16. **During his Imprisonment & Observation at the Psychiatric Facility, Keith was never diagnosed with a Mental Illness, was never adjudicated Mentally Ill by a Court and was never prescribed any Psychiatric Medication.**

55. After being released on 9/12/16 and over the course of the next month, Keith continued to experience daily harassment, stalking and public defamation directed by the Republican Party.

As the political environment grew more and more tense heading into the November Presidential elections, the harassment and stalking behavior by the Republican Party continued to worsen.

56. Heading into October, Keith began to receive daily death threats, threats of violence, threats of malicious prosecution, public defamation and racial, sexual and disability discrimination through political signs and propaganda **(See Exhibit F)**. Many of these threats were written on license plates and vehicles stalking the Plaintiff while he drove making it difficult for him to record and photograph each one while also driving his vehicle. They included the following:

56.1) Numerous vehicles with DIE or derivations of DIE written on their license plates, red vehicles with skeletons hanging out the back of their trunks, vehicles with gun stickers and Confederate flags next to Trump / Pence stickers on their rear windows following him everywhere he went.

56.2) Men brandishing fire arms in public areas, exposing the fire arms on their waists as he walked by.

56.3) An Orange semi-truck following him everywhere he went with the word "SKELTON" on the side, taken as a death threat to stay out of Florida.

56.4) Illegal prescription drugs being sent to his Apartment to frame him for drug crimes.

56.5) Feces and animal waste being placed in the office next to his while he was working forcing him to leave given the horrible smell.

56.6) Dangerous animals including large snakes and even bears being released on the Bike Trail as he biked.

56.7) Coordinated disability discrimination by the Catholic Church he attended. Rumors being spread throughout the Church that he had a Severe Mental Illness, shunning him from the community.

56.8) Defamations being spread that he was currently on Human Growth Hormone and Performance Enhancing Drugs, despite there being no legal evidence to support these claims.

56.9) Defamations being spread that he was currently a Heroin and Cocaine addict and had fainted in September due to overdosing on Cocaine (patently untrue).

56.10) Defamations being spread alleging that he was a Sexual Assaulter and a Woman Hater, despite there being no legal evidence to support these claims and despite him never being arrested or charged with Sexual Assault.

56.11) Large scale sexual harassment and defamations being spread that he had a small penis. Dozens of blonde women directed by the Republican Party to follow him wherever he went walking small "wiener" dogs on red leashes to publicly ridicule him, laughing at him as he walked by.

56.12) Defamations being spread that he had fathered an illegitimate child with a Hispanic woman months earlier, despite there being no proof to support these claims.

56.13) Defamations being spread that he was Schizophrenic. Vehicles with Handicap stickers following him wherever he went, ridiculing him for an alleged Disability (even though he had never been diagnosed with a Mental Illness or adjudicated Mentally Ill).

56.14) Defamations being spread that he was a child abuser and pedophile.

56.15) Individuals being instructed to wear leopard print glasses and clothing to taunt and intimidate him for being a "leper" and social outcast

56.16) Pictures of rats and rodents carrying skulls being placed in his office to further intimidate and taunt him

56.17) Aggressive and reckless driving by dozens of vehicles on the road attempting to cause him to crash as he rode his vehicle and bicycle on the streets.

57. Additionally, it was at this time that Keith also began to suspect that all of his electronic devices, including his work and home computers, laptops and cell phones were being illegally hacked into and monitored to obtain sensitive financial and personal information about him and his Company to further defame, discredit and harass him, in blatant violation of his constitutional right to privacy.

58. Keith began to notice that many of his electronic devices were acting strangely, frequently re-booting, stalling and displaying numerous irregularities and overt messages suggesting that they were hacked and monitored.

59. As further proof of this, Keith began to receive many of the same harassing and derogatory messages outlined in point 53 through "selective push-notifications" on his cellular devices, as well as harassing cellular phone calls to his devices that would display many of the same messages on his Caller ID. The volume of political emails, spam calls and push notifications on his cellular devices and computers increased exponentially during this time.

60. Specifically, Keith began to notice rumors being spread on a large scale at the direction of the Republican Party and its Affiliates regarding his personal financial information, including explicit details on his bank account balances, financial and accounting information regarding his

personal and Company tax returns, as well as other private details seized from his electronic devices and emails. Such financial information regarding himself and his Company were never publicly released by Keith and could only have been obtained through the illegal hacking of his devices and the subsequent malicious public dissemination of such data and information.

61. Most maliciously, Keith began to notice at this time that false rumors were being widely propagated on a national scale regarding his Company, its finances and patient information, to further defame Keith and harm his reputation. Such invasions of privacy and public defamations were being done solely for political gain and as further retaliation for the Whistle-Blower law-suit that he had initially threatened to file.

62. In particular, wide-spread rumors began to circulate that Keith's Company was being audited by Government regulators for billing irregularities. Keith began to face public taunts and intimidations suggesting that if he proceeded with filing a law-suit, his Company would be subject to further retaliatory audits and prosecution. Such rumors were patently false as Keith's Company had never previously been subject to an audit.

63. As further evidence of the national scale of such defamations being directed by the Republican National Committee, Keith began to notice such defamations and taunts targeting himself and his Company being widely spread through news media outlets, including CNN, ESPN and advertising through covert and subliminal messaging and retaliatory propaganda.

64. As the political climate intensified heading into the November elections, the blatant hate and harassing behavior being directed by the Republican Party towards Keith continued to grow.

65. Keith was troubled and concerned about this grossly negligent harassment, defamation and stalking behavior being directed by the Republican Party, as Keith was not a Politician and was

not running for political office. Quite frankly, he just didn't get why they were so obsessed with him.

66. This tense environment of hate created by the Republican Party & Law Enforcement finally boiled over on 10/20/16, when Keith was illegally arrested under the Florida Baker Act in highly suspicious circumstances.

67. Early that day on 10/20/16, Keith sent two "Official Complaint Letters" to the Republican Party of Seminole County and The Republican Party of Florida outlining his complaints to their gross negligence, harassment, stalking and defamations, threatening legal action against them **(See Exhibit G)**.

68. Right after sending these Complaint Letters, Keith went on his daily bike ride heading South on International Pkwy towards the Bike Trail. At that point, Keith was only comfortable riding on the Trail or side-walk as he had experienced multiple vehicles pull out in front of him on the street in an attempt to get him to crash his Bike.

69. As Keith reached the intersection to enter the Bike Trail, he made a left and entered the road to cross the street. When Keith pulled into the median of the road, there were no vehicles for at least 50 yards in both directions, other than a White compact vehicle that was stopped at the opposite entrance to the intersection.

70. As Keith was riding in the median of the intersection, the compact vehicle pulled out aggressively from the opposite intersection driving directly into Keith's path to make a left to travel South-Bound on International Pkwy. In the process, the driver nearly ran into Keith at an accelerated rate of speed on his Bike.

71. Keith was in plain view of the vehicle when he pulled out aggressively into the intersection of the Road causing Keith to swerve to avoid the vehicle.

72. To avoid Keith taking a picture of his Plate, the driver began illegally backing up for 100 feet down a side road. The driver could of easily pulled ahead to drive away, however his main concern at the time was not exposing his License Plate.

73. After following the Driver, Keith was eventually able to take a picture of the plate. The driver then drove away from the scene down another side road.

74. As soon as Keith had secured a picture of the Plate, he proceeded to call the Police to report the Reckless Driving incident. Keith knew he had done nothing illegal and voluntarily wanted to report the incident. Keith then called 911 and reported the incident. He was then told that a Lake Mary Police Officer would be dispatched to the scene.

75. As Keith was waiting for the police to arrive to the scene, he noticed a large Blue Pick-Up Truck drive by him waiving a massive "Trump-Pence Flag" in the Trunk. The driver began giving a Thumbs-Up sign to Keith as he drove by him waving the Flag.

76. After seeing the Trump-Pence Flag and the driver giving him a Thumbs-Up, Keith feared the Police were tipped-off by the Republican Party beforehand and that they would treat him unfairly and possible falsely arrest and imprison him.

77. As soon as the Police arrived to the scene, they began speaking to Keith in a condescending manner, questioning his story and looking at him skeptically, beginning to treat him like he was "Severely Mentally Ill".

78. Additional Deputies from both the Lake Mary Police Department and Seminole County Sheriff's Office were then called to the scene. Keith did not understand why there was such a large police presence for this minor incident and thought he was being treated in a discriminatory manner.

79. Keith's Mother then randomly appeared at the scene, violating a "Legal No Contact Order" that he had sent her weeks earlier after the first Baker Act Incident which she also influenced and manipulated. **(See Exhibit H)** Again, Keith believed that his Mom was being tipped off by the Republican Party through her network of friends. Keith also had experienced several domestic violence incidents with his Mother in the past. When Keith asked his Mother why she was there, she lied to him and said she had been driving by "randomly" to "visit a friend in the area and saw the scene."

80. Keith believed that his Mother had been tipped-off by the Republican Party or Law Enforcement in order to further defame him to justify a Baker Act. He told Police that she was violating a Legal No Contact Letter, but they ignored him. Unsurprisingly, this attestation did not make it into the Police Report.

81. In the Official Police Report **(See Exhibit I)**, it states the following: "Keith's mother stated that she believed [Keith] had undiagnosed mental issues. The female stated that she believed [Keith] was delusional."

82. After showing up to the scene randomly and defaming him, Keith's mother then abruptly left the scene, furthering his notion that she had been tipped-off.

83. Additionally, in the beginning of the Police report, the Arresting Officer, Officer Ionut Komives, states: "The Complainant (Keith) stated that he had been Baker Acted twice before."

84. This is a false statement in the Police Report. Keith never told the Officer this on the scene. Keith believes this proves that the Officer was tipped-off before arriving to the scene, as there would be no other way to know this fact.

85. Officer Komives then goes on to state the following as justification for Baker Acting him: "Based on all accounts, the Complainant is a danger to others and or himself if left untreated or undiagnosed. The Complainant doesn't appear to be able to determine for himself whether examination is necessary…Without treatment the Complainant most likely will harm someone…"

86. Keith has never been in a physical fight in his life and has never once harmed anyone. He has no violent background. Keith believes that this extrapolation by the Officer was unjust and not reflective of the reality of the situation and that the stringent criteria required to initiate the Baker Act were not met. He further believes the Officer had been tipped-off to the scene by the Republican Party and Law Enforcement and was publicly arresting him solely for retaliatory and political reasons.

87. Solidifying this belief that the Police had been tipped off beforehand, Keith noted that there was a large Camouflage military duffel bag with a Handicap sticker planted in the back of the Arresting Officer's squad car as he was transferred to the Baker Facility, another intimidation tactic by Police.

88. Keith was then transferred to the Seminole Behavioral Center where he stayed imprisoned under observation until he was released on Sunday 10/23/16. **While under observation at the Psychiatric Facility, Keith again was not diagnosed with a Mental Illness, was not prescribed any Psychiatric Drugs and was not Adjudicated Mentally Ill.**

## COUNT I - DEFAMATION

89. Each of the paragraphs of this Complaint is incorporated as if restated fully herein.

90. The Statements, individually and collectively, referred to herein have caused, are causing, and will cause Plaintiffs to suffer injury to their professional standing, business opportunities, reputation and good name; and, they have held and will continue to hold Plaintiffs up to public scandal and ridicule. The Statements were calculated to, and do, expose Plaintiffs to public scorn, hatred, and ridicule. By such public Statements, Defendants did injure the Plaintiffs' reputation within the business community, their professional circles and in the community at large. Additionally, the widely spread defamations have put the Plaintiffs' life in danger and have caused substantial loss of future business opportunity and earnings. The public dissemination of Statements proximately caused general and special damages to the Plaintiffs. The Statements have adversely impacted the Plaintiffs' credibility, and opportunities. The Statements have damaged Plaintiffs' professional standing. The Statements have proximately caused Plaintiff emotional, psychological and physical trauma and suffering which is continuing.

## COUNT II – INVASION OF PRIVACY & CONSPIRACY TO VIOLATE CIVIL RIGHT TO PRIVACY

91. This Count is in reference to Paragraphs 57 – 63 of this Complaint.

92. Defendants conspired to invade and violate Plaintiffs' statutory civil rights to privacy by abusing their governmental powers and associations to illegally monitor and hack into the Plaintiff's electronic devices, including his cell phones, personal computers and other devices, to seize confidential personal, financial and Company information and widely disseminate it in misleading and false ways for the sole purpose of causing the Plaintiffs' unneeded emotional and financial harm.

## COUNT III – INTENTIONAL INFLICTION OF EMOTIONAL DISTRESS

93. Each of the paragraphs of this Complaint is incorporated as if restated fully herein.

94. Defendants engaged in, instigated and directed a course of extreme and outrageous conduct with the intention of causing, or reckless disregard of the probability of causing, emotional distress to Plaintiffs.

95. As a result of the Defendants highly-coordinated and outrageous treatment of the Plaintiffs, including large scale coordinated harassment, stalking, racial, sexual and disability discrimination, induced psychiatric abuse and physical assault, unwarranted surveillance, police misconduct and abuse of power, the Plaintiffs have suffered humiliation and severe emotional distress.

## COUNT IV – NEGLIGENT INFLICTION OF EMOTIONAL DISTRESS

96. Each of the paragraphs of this Complaint is incorporated as if restated fully herein.

97. Defendants have a duty to ensure that all political and police activity is free of discrimination, harassment, humiliation, hostility and retaliatory behavior. Defendants, in failing to adequately consider, investigate and resolve the Plaintiffs' complaints of coordinated public discrimination, marginalization and harassment, subjected the Plaintiff to suffer additional severe and un-needed humiliation and emotional distress.

## COUNT V – MALPRACTICE & PHYSICAL ASSAULT

98. This Count is in reference to Paragraphs 39 – 44 of this Complaint.

99. Defendants instigated and directed a course of extreme and outrageous conduct and medical malpractice while the Plaintiff was detained in the South Seminole Hospital, ultimately causing him to incur substantial unneeded physical and emotional harm and risk of brain damage and death.

100. Despite the Plaintiff acquiescing to the Physician's request to stop speaking when demanded, the Physician still administered a negligently high dose of medication to the Plaintiff for the sole purposes of punishing him, causing him to completely lose conscience, almost fall to the floor and urinate himself, indications of an overdosing. Such negligent behavior and malpractice caused the Plaintiff to suffer physical harm and risk permanent brain damage.

101. Defendants also engaged in, instigated and directed a course of extreme and outrageous conduct by disseminating the Plaintiff's personal and confidential health information regarding this event to further shame and embarrass him, as explicitly confirmed to the Plaintiff by the specific foreknowledge of the incident by a random man in the Hospital he was later taken to.

## COUNT VI – CONSPIRACY TO VIOLATE CIVIL RIGHTS

102. Each of the paragraphs of this Complaint is incorporated as if restated fully herein.

103. Defendants conspired to violate Plaintiffs' statutory civil rights by acting in collusion to create an environment of intimidation and coercion, through devious means including large-scale and highly coordinated harassment, verbal and written threats, and means of racial, sexual and disability discrimination to violate the Plaintiff's rights under 42 U.S.C. § 1983.

## COUNT VII – FALSE ARREST, MALPRACTICE & FALSE IMPRISONMENT

104. This Count is in reference to Exhibit B, C, D and E of this Complaint.

105. Defendants abused the criminal process to falsely arrest the Plaintiff under the Baker Act with reckless disregard for fully evaluating and investigating the truth regarding his statements on the harassments he incurred for threatening to file a whistleblower lawsuit against a large Insurance Company. The Defendants arrested and detained the Plaintiff without satisfying the criteria for imminent physical threat required to initiate such proceedings and as direct retaliation for the Plaintiff asserting his constitutional right to the Arresting Officer to bear arms.

106. Defendants further violated the Plaintiff's civil rights while detained under the Baker Act, by keeping him past the 72-hour mandated involuntary holding period without an Official Court Order as direct retaliation and punishment for the Plaintiff asserting his civil rights while being detained within the facility. Additionally, upon being threatened with lawsuit, the Defendants refused to release the medical records for the Plaintiff and/or destroyed them.

107. Such actions to hold the Plaintiff past the 72-hour involuntary holding period without a Court Oder caused the Plaintiffs to suffer immense emotional, financial and physical harm, as well as attempted sexual assault by a severely Schizophrenic patient.

## COUNT VIII – MALICIOUS ABUSE OF PROCESSES, FALSE ARREST & FALSE IMPRISONMENT

108. This Count is in reference to Paragraphs 66 – 88 of this Complaint.

109. Defendants, in tight coercion with one another, abused the criminal process against the Plaintiff in order to publicly humiliate him, intimidate him and dissuade him from asserting his rights against the Defendants and for the sole purposes of promoting larger political gain in advance of major local, state and federal elections.

110. Defendants abused the criminal process to falsely arrest and imprison the Plaintiff under the Baker Act, despite him never satisfying the criteria of imminent physical threat required to initiate such proceedings and in suspicious and highly politically motivated circumstances.

111. As described more fully above, all of the Defendants, while acting individually, jointly and in conspiracy, as well as under the color of law and within the scope of their employment, caused Plaintiff to be falsely arrested and imprisoned in violation of his Constitutional Rights.

112. As a result of this violation, Plaintiff suffered injuries, including but not limited to emotional distress, as is more fully alleged above.

113. The misconduct described in this Count that was undertaken was objectively unreasonable and was undertaken with willful indifference to Plaintiffs' Constitutional Rights.

## PRAYER FOR RELIEF

WHEREFORE, Plaintiffs prays for relief as follows:

a. A declaration that the Defendants' conduct violated the Plaintiffs' U.S. Constitutional Rights in the manners alleged herein;
b. A mandatory injunction requiring that Defendants possessing any arrest information arising from the actions complained of herein shall collect and deliver the Plaintiffs all such records and expunge or delete such information from their records;
c. An injunction enjoining Defendants from engaging in conduct to unlawfully disrupt, disperse, interfere with or prevent the lawful First Amendment activities explained of herein;
d. Award Plaintiffs compensatory damages of $40,000,000.00 against the Defendants, including but not limited to physical abuse and injury, emotional pain and suffering, irreparable financial and reputational damage and recompensable costs related to criminal defenses and any other compensatory damages as permitted by law and according to proof at trial;
e. Award Plaintiffs exemplary and punitive damages of $40,000,000.00 in favor of Plaintiffs;
f. Award attorneys' fees pursuant to 42 U.S.C. § 1988;
g. Award cost of suits pursuant to 42 U.S.C. §§ 1920 and 1988; and,

h. Award such other and further relief as this Court may deem appropriate and equitable, including injunctive and declaratory relief as may be required in the interests of justice.

## JURY DEMAND

Plaintiff hereby requests a trial by Jury

Dated: November 15, 2016

Respectfully Submitted,

**Keith Fernandez**
Plaintiff

**Keith Fernandez, CEO**
**National Diagnostic Solutions LLC**
Plaintiff